CONCORD GENERAL MUTUAL INSUR-
ANCE COMPANY, Plaintiff,

v.

Arthur R. HILLS et al., Defendants.

The TRAVELERS INSURANCE COM-
PANY, Plaintiff,

v.

Buddy J. LAPHAM, Jr., et al.,
Defendants.

Civ. Nos. 12-153, 12-158.

United States District Court,
D. Maine, S. D.

June 30, 1972.

Jack H. Simmons, Lewiston, Me., for Concord General.

John J. Flaherty, John Paul Erler, Portland, Me., for Travelers.

Peter L. Murray, Portland, Me., for Hills.

Charles H. Abbott, Lewiston, Me., for Laphams.

Louis Scolnik, Lewiston, Me., for Emerson.

Irving Friedman, Lewiston, Me., for Henley.

## MEMORANDUM OF OPINION AND ORDER OF THE COURT

GIGNOUX, District Judge.

By these declaratory judgment actions Concord General Mutual Insurance Company (Concord) and The Travelers Insurance Company (Travelers) seek declarations as to the extent of their obligations to defend any suits arising out of an automobile accident which occurred on February 12, 1971 at Woodstock, Maine. Defendants in the Concord action are Edwin A. Emerson, Jr., the owner of the automobile and the named insured in the Concord policy; his 16-year old stepson, Randall Henley, whom Emerson had permitted to use the insured automobile; Buddy J. Lapham, Jr., whom Henley had in turn allowed to drive the automobile and who was the operator at the time of the accident; and Arthur R. Hills, who has filed suit in this Court against Emerson, Henley and Lapham for the personal injuries sustained by him and for the death of his wife, Eleanor J. Hills, in the accident.[1] Defendants in the Travelers action are Arthur R. Hills; Buddy J. Lapham, Jr.; and Buddy J. Lapham, Sr. (whose correct name is Willard F. Lapham), the named insured in the Travelers policy. The principal issue in both cases is the interpretation of the so-called "omnibus clause" in an automobile liability insurance policy.

The actions have been combined for trial and were tried to the Court without a jury on April 12, 1972. Diversity jurisdiction is conceded, and there is no substantial dispute as to the relevant facts.

## I.

### THE FACTS

Emerson, a resident of Norway, Maine, was the owner at all relevant times of a 1965 Ford ¾-ton pickup truck, which

---

1. Acting individually and as administrator of his wife's estate, Hills has filed suit in this Court, Docket No. 12–139, against Emerson, Henley and Lapham. Further proceedings in that suit have been stayed pending determination of the obligations of the plaintiff insurance companies in these actions.

he used both for personal purposes and for business purposes in connection with his rubbish collection business. For several weeks prior to the February 12, 1971 accident, Emerson had permitted Henley, who had recently obtained a driver's license, to use the pickup truck whenever it was not being used by his stepfather or other employees of the business. Emerson had allowed Henley to drive the truck to and from school, to do errands, and for social purposes in the evenings and on weekends. Each time Henley took the truck he was required to ask permission of his stepfather, and he was repeatedly cautioned both by Emerson and by his wife to keep out of trouble, not to drink, and not to loan the truck to anyone. Unknown to the Emersons, however, on at least four occasions prior to the accident, Henley had permitted his young friend, Buddy J. Lapham, Jr., to use the truck alone, mostly at night, to pick up a girl or to go to the store. On at least three other occasions Henley had allowed Lapham to drive the truck while Henley was with him. The Emersons were also unaware that the two boys had been drinking beer while using the truck, and that on several occasions Lapham had been seen driving the truck, with Henley as a passenger, on the main street of South Paris and in other public places. Henley had made it clear, and Lapham understood, that Emerson had prohibited Henley's loaning the truck to anyone.[2]

Early on the evening of February 12 Emerson gave Henley permission to take the truck to Bethel to visit a girl friend. Emerson and his wife once again instructed Henley to stay out of trouble, not to drink, and not to "loan the truck to anyone." Henley left the Emerson house between 5 and 6 p. m. He picked up Lapham and two other boys. The foursome drove around South Paris for awhile; purchased a case of beer at a local market; drove around South Paris again, drinking beer; and visited some girls in Bryant Pond, where they left one of the boys. Henley, Lapham, and the other boy then drove to Bethel to see Henley's girl friend. They arrived at the girl friend's home around 8 p. m. Henley and the third boy decided to stay at the girl friend's house. Henley turned over the truck to Lapham with the understanding that he would return in a few hours to pick up Henley and the other boy. Lapham drove off to rejoin the other members of the group at Bryant Pond. A short time later, in Woodstock, not far from Bryant Pond, he was involved in an accident, in which Arthur R. Hills sustained serious personal injuries and his wife, Eleanor J. Hills, was killed.

## II.

### THE CONCORD POLICY

A. *The Omnibus Clause.*

Concord seeks a declaration by this Court that neither Henley nor Lapham was an insured under its policy.

The Concord policy in effect at the time of the accident listed Emerson as the named insured and contained a standard omnibus clause, which defined the word "insured" as follows:

III. *Definition of Insured:* (a) With respect to the insurance for bodily injury liability and for property damage liability the unqualified word "insured" includes the named insured and, if the named insured is an individual, his spouse if a resident of the same household, and also includes any person while using the automobile and any person or organization legally responsible for the use thereof, *provided the actual use of the automobile is by the named insured or such spouse or with the permission of either. . . .* (Emphasis supplied.)

2. When pressed on cross-examination, Henley admitted that he had informed Lapham, prior to the night of the accident, that Emerson would not permit him to loan the truck to anyone. Lapham vigorously denied knowledge of any such restriction, but he did admit that he never operated the truck in the vicinity of the Emerson household. On all the evidence, the Court is satisfied that Lapham fully understood that Emerson had forbidden Henley to let anyone else drive the truck.

The question presented is whether Henley and Lapham were additional insureds of Concord under this omnibus clause. The answer to that question turns upon whether the "actual use" of Emerson's automobile at the time of the accident was "with the permission of" Emerson within the meaning of the policy provision. Both parties agree that the construction of the policy is to be governed by the law of Maine and that there is no Maine case precisely in point. For the reasons to be stated, however, the Court is persuaded that the Maine court would hold that Concord's policy did not, under the circumstances of this accident, extend coverage to Henley and Lapham.

■ The law is well established that when the named insured expressly prohibits the use of his automobile by any person other than his permittee, a second permittee using the car solely for his own benefit does not do so with the permission of the named insured. Western Casualty & Surety Co. v. Grice, 422 F.2d 921 (10th Cir. 1970); Farmer v. Fidelity & Casualty Co. of N. Y., 249 F.2d 185 (4th Cir. 1957); Royal Indemnity Company v. Clingan, 238 F.Supp. 448 (E.D. Tenn.1965), modified on other grounds, 364 F.2d 154 (6th Cir. 1966); 7 Appleman, Insurance Law and Practice § 4361, Anno. 4 A.L.R.3d 10, 40, 61; 7 Am.Jur.2d Automobile Insurance § 116. Cf. Duff v. Alliance Mutual Casualty Co., 296 F.2d 506 (10th Cir. 1961); Horn v. Allied Mutual Casualty Co., 272 F.2d 76 (10th Cir. 1959).[3] The present case falls squarely within this general rule. While Emerson gave Henley permission to use the insured car for his own social purposes, both Emerson and his wife had explicitly instructed Henley that he was not to permit anyone else to use the car. It is clear that Henley disobeyed this instruction by permitting Lapham to take the car. It is equally clear that at the time of the accident Lapham was using the car for his own benefit and was not serving any purpose of Henley.

■ Defendants seek to bring this case within one or more of the exceptions to the general rule which have been held not to preclude recovery under an omnibus clause. But they can point to no exception which is here applicable. This is not a case where coverage may be permitted because the original permittee was riding in the car with the second permittee at the time of the accident. Compare, e. g., Standard Accident Insurance Co. v. New Amsterdam Casualty Co., 249 F.2d 847 (7th Cir. 1957); Maryland Casualty Co. v. Marshbank, 226 F.2d 637 (3rd Cir. 1955); Protective Fire and Casualty Co. v. Cornelius, 176 Neb. 75, 125 N.W.2d 179 (1963); Brooks v. Delta Fire and Casualty Co., 82 So.2d 55 (La. App.1955); Loffler v. Boston Insurance Co., 120 A.2d 691 (Mun.Ct.App.D.C. 1956). This is not a case where recovery may be allowed because the second permittee was serving some purpose of the first permittee. Compare, e. g., National Farmers Union Property & Casualty Co. v. Lukins, 329 F.2d 564 (8th Cir. 1964); National Farmers Union Property & Casualty Co. v. State Farm Mutual Auto Insurance Co., 277 F.Supp. 542 (D.Mont. 1967). Nor is this a case where the use of the car by the second permittee may come within the protection of the omnibus clause because the named insured has granted the first permittee such "unfettered dominion" over the automobile that he may be said to have impliedly granted permission to allow others to use the car. Compare, e. g., Standard Accident Insur-

---

3. A contrary result has been reached in a few jurisdictions which have adopted the so-called "initial permission" rule. See, e. g., Odolecki v. Hartford Accident & Indemnity Co., 55 N.J. 542, 264 A.2d 38 (1970); Standard Accident Insurance Co. v. New Amsterdam Casualty Co., 249 F.2d 847 (7th Cir. 1957) (applying Illinois law). That rule provides that once permission has been given to a permittee to use the vehicle, any subsequent deviation from that permission, no matter how gross, does not deprive the permittee of coverage. As discussed below, the Maine court has squarely rejected such a rule. Savage v. American Mutual Liability Insurance Co., 158 Me. 259, 261, 182 A.2d 669 (1962); Johnson v. American Automobile Insurance Co., 131 Me. 288, 161 A. 496 (1932).

ance Co. v. Allstate Insurance Co., 72 N.J.Super. 402, 178 A.2d 358 (1962). The undisputed facts are that Henley was not in the car at the time of the accident; that Lapham was using the car solely for his own purposes when the accident occurred; and that, far from having "unfettered dominion" over his stepfather's car, Henley was always required to seek permission before each use of the car and was repeatedly instructed by his parents never to lend it to anyone. This Court is aware of no case holding that an omnibus clause extends coverage to a second permittee under the circumstances here presented.

As earlier stated, the Maine courts have never passed upon the precise issue presented by this case. But related Maine cases leave little doubt that the Maine courts would follow the general rule denying coverage in these circumstances. The Supreme Judicial Court of Maine has twice been confronted with the analogous question of whether the use of an automobile by a first permittee who has substantially deviated from the permitted use was with the permission of the named insured within the meaning of the omnibus clause in an automobile liability policy. On each occasion the Court has held that "coverage extends to the operator only if his use at the time and place of the accident is within the scope of the permission granted by the assured." Savage v. American Mutual Liability Insurance Co., 158 Me. 259, 261, 182 A.2d 669, 670 (1962); Johnson v. American Automobile Insurance Co., 131 Me. 288, 161 A. 496 (1932). Only ten years ago, in *Savage*, the Court specifically declined to depart from this so-called "strict" rule, which it had first announced in *Johnson*, and refused to adopt the so-called "initial permission" rule, which prevails in a few jurisdictions. *See*, note 3 *supra*. In doing so, the Maine court also made clear that, while ambiguous language in an insurance policy is to be construed most strongly against the insurer, "if the terms of the policy present no ambiguity, they are to be taken and understood, as

a usual thing, according to their plain and ordinary sense." Johnson v. American Automobile Insurance Co., *supra* at 292, 161 A. at 498 (citations omitted). As a general principle applicable to the construction of an insurance policy, the Maine court has likewise declared: "The terms of a policy cannot be enlarged or diminished by judicial construction. The function of the court is not to make a new contract, but to ascertain the meaning and intention of that actually made." *Id.* at 293, 161 A. at 498 (citation omitted).

Although the principles stated above were announced in cases involving a substantial deviation from a permitted use by a first permittee, they are persuasive that under the law of Maine the use of an automobile by a second permittee for his own purposes, where the owner has expressly forbidden such use, is not "with the permission of" the owner. The Court holds, therefore, that neither Henley nor Lapham was an insured under Concord's policy at the time of the accident and that Concord is under no obligation to defend any suits against Henley or Lapham arising from the accident, or to pay any resulting judgment for damages.

B. *Punitive Damages.*

▆▆ Concord's complaint also seeks a declaration by this Court that its policy does not include an obligation to pay punitive damages. The relevant policy provisions provide as follows:

I. *Coverage A—Bodily Injury Liability*: To pay on behalf of the insured *all sums* which the insured shall become legally obligated to pay *as damages* because of bodily injury, sickness or disease, including death at any time resulting therefrom, sustained by any person, caused by accident and arising out of the ownership, maintenance or use of the automobile.

*Coverage B—Property Damage Liability*: To pay on behalf of the insured *all sums* which the insured shall become legally obligated to pay as *damages* because of injury to or destruc-

tion of property, including the loss of use thereof, caused by accident and arising out of the ownership, maintenance or use of the automobile. (emphasis supplied).

It is well settled that such broad provisions in automobile liability policies unmistakably include both compensatory and punitive damages. Pennsylvania Threshermen & Farmers' Mutual Casualty Ins. Co. v. Thornton, 244 F.2d 823, 827 (4th Cir. 1957); General Casualty Co. of America v. Woodby, 238 F.2d 452, 457–458 (6th Cir. 1956); United States Fidelity and Guaranty Co. v. Janich, 3 F.R.D. 16, 19 (S.D.Cal.1943); Carroway v. Johnson, 245 S.C. 200, 139 S.E.2d 908 (1965); Couch on Insurance § 56:27 (1966). *But see* Northwestern National Casualty Company v. McNulty, 307 F.2d 432 (5th Cir. 1962). Concord apparently concedes such coverage by its failure to brief the issue.

The Court holds that the coverage of the Concord policy includes an obligation to pay punitive damages.

### III.

### THE TRAVELERS POLICY

Travelers seeks a declaration by this Court that Buddy J. Lapham, Jr., was not an insured under the policy issued by it to his father, Willard F. Lapham.

The Travelers policy in effect at the time of the accident listed Willard F. Lapham as the named insured and contained the following relevant provisions:

*Part I—Liability*

*Coverage A—Bodily Injury Liability; Coverage B—Property Damage Liability*

The company will pay on behalf of the insured all sums which the insured shall become legally obligated to pay as damages because of:

A. bodily injury or

B. property damage

to which this insurance applies, arising out of the ownership, maintenance or use of the owned automobile or any non-owned automobile. . . .

*Persons Insured*

Each of the following is an insured under Part I:

&ast; &ast; &ast; &ast; &ast; &ast;

(b) with respect to a non-owned automobile,

  (1) the named insured,

  (2) any relative, *but only with respect to a private passenger automobile or trailer,*

*provided actual operation by the named insured or relative or (if he is not operating) the other actual use thereof is with the permission, or reasonably believed to be with the permission, of the owner and is within the scope of such permission.*

. . .

*Definitions*

Under Part I:

&ast; &ast; &ast; &ast; &ast; &ast;

"owned automobile" means

(a) *a private passenger or utility automobile described in Item 3 of the declaration for which a specific premium charge indicates that coverage is afforded,*

&ast; &ast; &ast; &ast; &ast; &ast;

(c) *a private passenger or utility automobile ownership of which is acquired by the named insured during the policy period.*

. . .

&ast; &ast; &ast; &ast; &ast; &ast;

"*private passenger automobile*" *means a four wheel private passenger or station wagon type automobile;*

"*utility automobile*" *means an automobile of the truck type with a load capacity of 1500 pounds or less* not used for wholesale or retail delivery other than farming or deliveries incidental to the named insured's occupation as a craftsman or as an installer or repairer of furnishings or equipment;

&ast; &ast; &ast; &ast; &ast; &ast;

(Emphasis supplied.)

Buddy Lapham was not a named insured in the Travelers policy, nor was he operating a vehicle owned by the named insured at the time of the accident. The policy therefore covers Buddy Lapham only if he is protected by paragraph (b) (2) under *Persons Insured,* relating to the operation of a non-owned automobile by a relative of the named insured. Two questions are presented: (1) Was the 1965 ¾-ton pickup truck which Buddy Lapham was operating at the time of the accident a "private passenger automobile" within the meaning of paragraph (b) (2); (2) was Buddy Lapham's operation of the pickup truck at the time of the accident "with the permission, or reasonably believed to be with the permission," of Emerson and "within the scope of such permission" within the meaning of the same policy provision. The Court concludes that a negative answer must be given to both questions.

█ As in the Concord case, the parties agree that Maine law is controlling and that there is no Maine case in point. The Supreme Judicial Court of Maine, however, has laid down the general principles applicable to the construction of automobile liability policies. Thus, as previously noted, in Johnson v. American Automobile Insurance Co., *supra,* the court stated:

. . . If the terms of the policy present no ambiguity, they are to be taken and understood, as a usual thing, according to their plain and ordinary sense. Parties contracting in writing are supposed to have the intentions which their agreemnt effectually manifests.

\* \* \* \* \* \*

The terms of a policy cannot be enlarged or diminished by judicial construction. The function of the court is not to make a new contract, but to ascertain the meaning and intention of that actually made. *Id.* 131 Me. at 292–293, 161 A. at 498 (citations omitted). *See also* Limberis v. Aetna Casualty and Surety Co., 263 A.2d 83, 86 (Me.1970); Farm Bureau Mutual Insurance Co. v. Waugh, 159 Me. 115,

119–121, 188 A.2d 889 (1963); Poisson v. Travelers Insurance Co., 139 Me. 365, 31 A.2d 233 (1943).

The Maine court has also made clear that the meaning of the terms of a policy, and the intention of the parties, is to be determined from an examination of the policy as a whole:

A contract of insurance, like any other contract, is to be construed in accordance with the intention of the parties, which is to be ascertained from an examination of the whole instrument. All parts and clauses must be considered together that it may be seen if and how far one clause is explained, modified, limited or controlled by the others. Swift v. Patrons' Androscoggin Mutual Fire Insurance Co., 125 Me. 255, 256, 132 A. 745, 746 (1926). *See also* Wheeler v. Phoenix Assurance Co., 144 Me. 105, 107, 65 A.2d 10 (1949).

**A.  *Private Passenger Automobile***

█ Construing the policy as a whole, there is no ambiguity as to the meaning of the term "private passenger automobile" in paragraph (b) (2). With respect to a non-owned automobile, paragraph (b) (2) limits the policy's coverage of an operator other than the named insured to a "private passenger automobile or trailer." No trailer was involved in the accident. The policy defines "private passenger automobile" as a "four wheel private passenger or station wagon type automobile." We are not concerned with a station wagon type automobile. Even if the phrase "private passsenger automobile" stood alone, the normal meaning of the term would exclude a pickup truck. Schmude v. Hansen, 28 Wis.2d 326, 137 N.W.2d 61, 63 (1965); Hartford Accident & Indemnity Co. v. Western Fire Insurance Co., 196 F.Supp. 419, 423 (E.D.Ky.1961); *Cf.* Marshall v. Washington National Insurance Co., 246 N.C. 447, 98 S.E.2d 345, 346 (1957). *But see* Detmer v. United Security Insurance Co., 309 S.W.2d 713 (Kan. City Ct. of App. (Mo.) 1958). But in the present policy the phrase does not stand alone. The pol-

icy expressly defines the term "utility automobile" to mean an "automobile of the truck type with a load capacity of 1500 pounds or less. . . ." The ¾-ton pickup truck Buddy Lapham was operating at the time of the accident clearly comes within this definition. *Cf.* Schmude v. Hansen, *supra*, 137 N.W.2d at 64. Paragraph (b) (2) specifically affords coverage to a non-owned private passenger automobile. It does not in terms extend coverage to a non-owned utility automobile. The necessary implication from this omission is that operation of a non-owned utility automobile is not covered. Home Indemnity Co. v. Northwestern National Insurance Co., 280 F.Supp. 446, 448 (D.Mont.1968). Moreover, any possible misunderstanding is dissipated by the definition of an owned automobile in paragraphs (a) and (c) under *Definitions.* Paragraphs (a) and (c) define "owned automobile" to include "a private passenger *or* utility automobile." (Emphasis supplied). It is thus evident that, read as a whole, the policy "provides a clear and consistent pattern of coverage." *Idem.* An owned automobile is covered whether it is a private passenger or a utility automobile. A non-owned automobile is covered only if it is a private passenger automobile.

Defendants have cited a number of cases which have held that the type of *use* to which a truck is being put at the time of the accident is determinative. *See* Fidelity and Casualty Co. of New York v. Martin, 66 F.2d 438 (9th Cir. 1933); Schilling v. Stockel, 26 Wis.2d 525, 133 N.W.2d 335, 340–341 (1965); Detmer v. United Security Insurance Co., *supra*; *cf.* Aetna Life Insurance Co. v. Bidwell, 192 Tenn. 627, 241 S.W.2d 595 (1951); Poncino v. Sierra Nevada Life and Casualty Co., 104 Cal.App. 671, 286 P. 729 (1930). But in each of these cases the phrase "private passenger automobile" was not defined or the court otherwise found the language of the policy to be ambiguous. There being no ambiguity in the terms of the present policy, there is no occasion for inquiry as to the purpose for which the pickup truck was being used

at the time of the accident. Home Indemnity Co. v. Northwestern National Insurance Co., *supra*; Marshall v. Washington National Insurance Co., *supra.* As the court stated in *Marshall,* "The use to which the insured put the truck could not and cannot change the plain meaning of the language of the policy or extend its coverage." *Id.,* 98 S.E.2d at 346.

### B. *Permission*

██ Whether or not the truck Buddy Lapham was operating at the time of the accident was a "private passenger automobile" within the meaning of paragraph (b) (2) of the Travelers policy, it is plain that his operation of the truck was not "with the permission, or reasonably believed to be with the permission" of Emerson and "within the scope of such permission" within the meaning of that policy provision. What has been said with respect to the coverage of the omnibus clause in the Concord policy sufficiently disposes of any suggestion that Lapham was operating the truck with Emerson's permission within the meaning of the Travelers policy. So also, Lapham's knowledge that Henley was forbidden to loan the truck negatives any reasonable belief by Lapham that he had such permission. *Cf.* State Farm Mutual Automobile Ins. Co. v. Zurich American Ins. Co., 118 N.J.Super. 84, 286 A.2d 517, 521–523 (1972).

\* \* \*

The Court holds that Buddy J. Lapham, Jr., was not an insured under the Travelers policy at the time of the accident and that Travelers is under no obligation to defend any suits arising out of the accident, or to pay any judgment for damages resulting therefrom.

### IV.

In the Concord case, judgment will be entered declaring that neither Henley nor Lapham was an insured under Concord's policy at the time of the accident and that Concord is under no obligation to defend any suits against Henley or Lapham arising therefrom, or to pay any resulting judgment for damages. The

judgment will further declare that the coverage of the Concord policy includes an obligation to pay punitive damages.

In the Travelers case, judgment will be entered declaring that Buddy J. Lapham, Jr., was not an insured under Travelers' policy at the time of the accident and that Travelers is under no obligation to defend any suits arising therefrom, or to pay any resulting judgment for damages.