**STATE of Maine**

v.

**Timothy F. FLAHERTY.**

Supreme Judicial Court of Maine.

April 18, 1979.

---

1. *But see Hall v. Cole,* 412 U.S. 1, 5, 93 S.Ct. 1943, 36 L.Ed.2d 702, 707 (1973).

Henry N. Berry, III, Dist. Atty., Peter G. Ballou (orally), Deputy Dist. Atty., Portland, for plaintiff.

Zuckerman & Avaunt by Lawrence J. Zuckerman, Gray (orally), Carl R. Trynor, Portland, for defendant.

Before McKUSICK, C. J., and POMEROY, ARCHIBALD, DELAHANTY, GODFREY and NICHOLS, JJ.

NICHOLS, Justice.

The Defendant, Timothy F. Flaherty, appeals from a judgment of conviction of the crime of possession of a firearm by a felon (15 M.R.S.A. § 393 (Supp.1978)) entered on a jury verdict returned July 12, 1978 in Superior Court in Cumberland County. He asserts that portions of the applicable statutes were unconstitutionally vague and that the omission of a crucial jury instruction relating to the Defendant's awareness of his control and possession of the firearm, constituted manifest error.

We sustain the appeal.

By an indictment returned May 3, 1978, the Defendant and his wife, Christine R. Flaherty, were charged with the theft of a hunting rifle belonging to Everard Giles. The jury was unable to reach a verdict on these charges of theft and a motion to dismiss these charges was granted. In a separate count of the same indictment the Defendant, Timothy F. Flaherty, was charged with the offense of possession of a firearm by a felon. At trial he stipulated to his prior conviction of a felony. He and his wife contended, however, that they were not aware of the presence of the firearm in the car which the Defendant was driving until shortly before they were stopped and arrested by the police.

The evidence at the trial revealed essentially the following facts: On February 21, 1978, the Defendant and his wife spent the day in Portland and Gorham in the company of Jerry Tuttle and Everard Giles, the latter a 74-year-old retired Maine hunting guide. They were drinking various alcoholic beverages most of the day and into the evening.

At about 8:00 P.M. these four persons, Tuttle, Giles, the Defendant and his wife left the Defendant's house and drove to Tuttle's residence in Gorham. Approximately one and one-half hours later at Giles' request the Defendant and his wife in Tuttle's compact car drove Giles to the camper, in Buxton, where Giles made his home.

There the drinking continued. Giles showed the Defendant and his wife his new hunting rifle. Giles did not at any later time see the Defendant or his wife with the gun.

The facts surrounding the departure of the Defendant and his wife were much disputed. It was agreed that about 11:00 P.M. the Defendant and Giles went outside to free the Tuttle car from an icy rut. The Defendant's wife may also have gone out to aid them. They all returned to the camper to warm up. The Defendant and his wife testified that Giles then went out with his rifle to round up his dogs so that they could all go coon hunting. The Defendant and his wife decided to leave and about 11:30 P.M. they did so. Giles testified that he had not moved the gun after initially showing it to them and that he had not intended to go coon hunting, which was out of season. The Defendant and his wife stressed, while Giles denied, the extreme drunkenness of Giles at this point.

The Defendant and his wife stated that they drove to Portland where they picked up Mrs. Flaherty's cousin, Andrea Johnston. Upon getting into the compact car, Mrs. Johnston found the rifle in the back of the car. The Defendant asserted that this was the first time he knew the rifle was in the car. He testified that he promptly checked it to see that it was not loaded. The Defendant then started to drive back to Buxton to return the rifle to Giles.

The Defendant, his wife and Andrea Johnston had proceeded only a few blocks along Portland streets when the police stopped the car and ordered all the passengers out. The police removed the rifle which at that time was lodged along the hump between the two front seats of Tuttle's compact car.

The key factual question in the case appears to have been the manner in which the rifle reached the Tuttle car. The Defendant's testimony raised the inference that Giles in his drunken state had put the gun in the car and then forgotten his actions. Giles denied any such lapse of memory or any such actions.

On the charge against the Defendant and his wife for theft of the rifle the jury was, however, unable to reach a unanimous verdict. In this posture of the case we must determine whether the conviction of the Defendant, a felon, for possession of the same rifle may stand.

The offense stated in 15 M.R.S.A. § 393 (Supp.1978) [1] forbids any felon to "own,

1. 15 M.R.S.A. § 393 (Supp.1978) states in relevant part:

1. No person who has been convicted of any crime, under the laws of the United

have in his possession or under his control any firearm." Applicable to this crime through 17–A M.R.S.A. § 6 (Supp.1978)[2] is 17–A M.R.S.A. § 51 (Supp.1978),[3] which in § 51(1) declares that a "person commits a crime only if he engages in voluntary conduct," and in § 51(3) further states:

> Possession is voluntary conduct only if the possessor knowingly procured or received the thing possessed or was aware of his control thereof for a sufficient period to have been able to terminate his possession.

The Defendant's basic claim of error was the absence of an instruction to the jury that the Defendant was not criminally liable for possession unless his possession was voluntary conduct, and that they must find the Defendant was aware of his control of the rifle for a sufficient period to have been able to terminate his possession. Because this point is raised for the first time on appeal, we must review the matter in terms of the standard of manifest error.

Manifest error was committed if there exists " 'a reasonable possibility that a complete instruction . . . would have resulted in a different verdict.' " *State v. Deveau*, Me., 354 A.2d 389, 392 (1976); *State v. McKeough*, Me., 300 A.2d 755, 761 (1973).

Had the jury found the Defendant and his wife guilty of the theft charge, we would have little trouble in upholding their verdict that the Defendant "possessed" the rifle within the meaning of 15 M.R.S.A. § 393. Here, however, the jury was unable to conclude that they had taken the rifle from Giles' camper. By failing to convict the Defendant and his wife of theft, there is a substantial possibility that some members of the jury believed their version of the events; that is, that they were unaware of the rifle in the automobile other than for the short period of time after Mrs. Johnston allegedly discovered it in the Tuttle car. The State produced no direct evidence that the Defendant was aware of his control of the rifle prior to the admitted discovery of it. Taken together, all these factors generate the real possibility that the jury found that the Defendant only became aware of the rifle when Mrs. Johnston discovered it, but concluded that the Defendant's admission that he had had the rifle in his control for a brief interlude thereafter was *ipso facto* possession or control sufficient to support a conviction under 15 M.R.S.A. § 393 (Supp.1978). Under an appropriate instruction in terms of § 51(3), which was never given,[4] however, the jury might reasonably

States, the State of Maine or any other state, which is punishable by one year or more imprisonment or any other crime which was committed with the use of a dangerous weapon or of a firearm against a person, except for a violation of Title 12, chapter 319, subchapter III, shall own, have in his possession or under his control any firearm, unless such a person has obtained a permit under this section. For the purposes of this subsection, a person shall be deemed to have been convicted upon the acceptance of a plea of guilty or nolo contendere or a verdict or finding of guilty by a court of competent jurisdiction.

**2.** 17–A M.R.S.A. § 6 (Supp.1978) reads in relevant part:

> 1. The provisions of chapters 1, 3, 5, 7, 47, 49, 51 and 53 are applicable to crimes defined outside this code, unless the context of the statute defining the crime clearly requires otherwise.

*3. 17–A M.R.S.A. § 51 (Supp.1978) reads in full:*

> 1. A person commits a crime only if he engages in voluntary conduct, including a voluntary act, or the voluntary omission to

perform an act of which he is physically capable.

> 2. A person who omits to perform an act does not commit a crime unless he has a legal duty to perform the act.

> 3. Possession is voluntary conduct only if the possessor knowingly procured or received the thing possessed or was aware of his control thereof for a sufficient period to have been able to terminate his possession.

This section is based on the New Hampshire Criminal Code 1973, § 626.1. It also tracks in large measure § 2.01 of the Model Penal Code. Subsection 3, especially, is similar to § 2.01(4) of the Model Penal Code.

**4.** The court's jury instruction in pertinent part stated only:

> No person who has been convicted of any crime . . . which was committed with the use of a dangerous weapon or a firearm against a person shall own, have in his possession or under his control any firearm unless such a person has obtained a permit under this section. That is the statute.

have concluded that the Defendant had not been aware of his control of the rifle for a sufficient period to have been able to terminate his possession. To omit such an instruction was manifest error.

 The Defendant next asserts that the term "a sufficient period" in § 51(3) is unconstitutionally vague. *See Knowlton v. State*, Me., 257 A.2d 409, 410 (1969). We conclude that the term is not unduly vague, but rather fixes a reasonable standard by which to evaluate the Defendant's actions in terminating his possession of the rifle.

The key word "sufficient" has been defined as "enough to meet the needs of a situation or a proposed end." *Webster's New Collegiate Dictionary* 1164 (1973). In the context of this statute the term requires an evaluation of the surrounding circumstances in order to determine whether the Defendant acted appropriately.[5]

Even in the absence of a provision comparable to § 51(3), this result has been reached under statutes similar to 15 M.R.S.A. § 393 (Supp.1978). In *People v. La Pella*, 272 N.Y. 81, 4 N.E.2d 943 (1936) the defendant was held entitled to an instruction that temporary possession incidental to a lawful purpose was not proscribed by a statute prohibiting possession of a concealed weapon by a person previously convicted of a crime. The defendant claimed to have found such a weapon twenty minutes before turning it over to the police. See also *People v. Stone*, 80 Misc.2d 536, 364 N.Y. S.2d 739, 742–43 (1975).

 We find these decisions instructive. They indicate that the "grace" period permitted by § 51(3) is designed to separate illegal possession from temporary control incidental to the lawful purpose of terminating possession. Thus a "sufficient period" is not always the absolute minimum time required to get rid of the contraband. So long as the Defendant's control of the contraband remains incidental to the lawful purpose of terminating his possession and, viewed under the circumstances, remains "temporary," it falls within the "sufficient period" permitted him by 17–A M.R.S.A. § 51(3) (Supp.1978).

The entry is:

Appeal sustained.

Judgment vacated.

Remanded for further proceedings consistent with the opinion herein.

WERNICK, J., did not sit.

---

5. In other contexts the term "sufficient" has been held to mean "reasonable."

Where a Tennessee statute provided that, following the appointing of an attorney, no further proceedings should be had until that attorney had had a "sufficient" opportunity to prepare the case, the Tennessee court held that the statutory language meant a reasonable time under the facts and circumstances of the case. *Brown v. State*, 553 S.W.2d 94, 96 (Tenn.Cr. App.1977).

Where a guaranty of a machine stated that if it should in any way prove defective, the purchaser should promptly notify the agent from whom he purchased it and allow "sufficient time" for a person to be sent to put it in order, and the defective part, if any, replaced, the Nebraska Supreme Court held the language of the guaranty to mean a reasonable time under the circumstances. *Sandwich Mfg. Co. v. Feary*, 22 Neb. 53, 33 N.W. 485, 491 (1887).

In an Arkansas case challenging an instruction that it was the duty of the carrier to stop the train a sufficient time to permit passengers to leave the car with safety, which instruction had been modified by changing the word "sufficient" to "reasonable," the Arkansas Supreme Court held that sufficient time was tantamount to giving the passenger a reasonable time to alight. *Barringer v. St. Louis, I. M. & S. R. Co.*, 73 Ark. 548, 85 S.W. 94, 95 (1905).

Where a Pennsylvania statute required exhaust fans of "sufficient" power or other "sufficient" devices to carry off poisonous fumes, gases and dust, the Pennsylvania Supreme Court declared that the word "sufficient" in the statute was a relative term depending upon the facts of each case. *Rebel v. Standard Sanitary Mfg. Co.*, 340 Pa. 313, 16 A.2d 534, 537 (1940).

We give a like meaning to the term "a sufficient period" in the statute we are here called upon to construe.